**LAW OFFICE OF CLIFFORD A. DOVER   SBN 169838**
**2701 Midway Drive #84872**
**San Diego, CA 92110**
**cliffdover@aol.com**
**(619) 209-8978**
**(619) 342-3194 facsimile**

**Attorney for Plaintiff SHALA MALEK**

# UNITED STATES DISTRICT COURT

## FOR THE SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SHALA MALEK, an individual,<br><br>Plaintiff,<br><br>vs.<br><br>VALENTIA APARTMENTS, LLC, dba VALENTIA, SHEA PROPERTIES MANAGEMENT COMPANY, INC. dba SHEA PROPERTIES, DANIELLE HARRIS,<br><br>Defendants. | Case No. '24CV2076 LL   BLM<br><br>**COMPLAINT FOR MONETARY, DECLARATORY, AND INJUNCTIVE RELIEF**<br><br>**DEMAND FOR TRIAL BY JURY** |

## I. INTRODUCTION

1. This action seeks monetary, declaratory and injunctive relief, alleging that Defendants have engaged in a pattern and practice of housing discrimination on the basis of disability in violation of the federal Fair Housing Amendments Act of 1988 ("FHAA"), 42. U.S.C.§3601 *et seq.;* the California Fair Employment and Housing Act ("FEHA"),  Government Code Sections 12900 *et seq.*; which prohibits housing discrimination based on disability; the California Unruh Civil Rights Act, Civil Code

---

Complaint

Sections 51 *et seq.*; and California Civil Code section 54.1 *et seq.*; the California Unfair Business Practices Statute, Business and Professions Code Sections 17200 *et seq.*; and for Fraud, Breach of Warranty of Habitability; Breach of Covenant of Quiet Enjoyment, Constructive Eviction, Retaliatory Eviction, and Negligence.

## II. JURISDICTION AND VENUE

2.      Jurisdiction is conferred upon this Court pursuant to 42 U.S.C. 3613, and California Govt Code §12989.1 regarding the FEHA claims.  Jurisdiction is also conferred upon this Court pursuant to 28 U.S.C. §1331 and  28 U.S.C. §1391, in that the claims alleged herein arise under the laws of the United States, and within this Court's jurisdiction.  This Court has supplemental jurisdiction pursuant to 28 U.S.C. section 1367 to hear and determine plaintiffs' state law claims as those claims are related to Plaintiffs' federal law claims and arise out of a common nucleus of related facts. Plaintiffs' state law claims are related to the federal law claims such that those claims form part of the same case or controversy under Article III of the United States Constitution.

3.      Venue is proper in that the claims alleged herein arose within San Diego County, California.

## III. PARTIES

4.      Plaintiff SHALA MALEK ("MALEK"), is a United States citizen over the age of 62, and a lessor of the rental premises known as the Valentia Apartments, (hereinafter also referred to as the "RENTAL PREMISES") during all relevant time periods stated herein.  The RENTAL PREMISES has the main address of 5305 Toscana Way, San Diego, California 92112, and consists of  approximately 318 rental units, and is a dwelling within the meaning of 42 U.S.C. section 3602.

5.  Plaintiff MALEK qualifies as "handicapped" or "disabled" within the meaning of section 802 of the Fair Housing Act, 42 U.S.C. section 3602(h), and California Gov't

Code section 12955.3, as defined in Gov't Code section 12926(i), in that she suffers from several disabilities, including multiple chemical sensitivities ("MCS"); osteoarthritis of multiple joints, osteoporosis, chronic neck/back pain, unsteady gait, chronic fatigue, chronic fibromyalgia, severe anxiety, and neuropathy, each of which affect one or more major life activities.

6.   At all times relevant herein, defendant VALENTIA APARTMENTS, LLC, dba VALENTIA, a California Limited Liability Company (hereinafter also referred to as "VALENTIA LLC") is or was the owners of the RENTAL PREMISES.

7.   At all times relevant herein, defendant SHEA PROPERTIES MANAGEMENT COMPANY, INC. dba SHEA PROPERTIES a California Corporation (hereinafter also referred to as "SHEA PROPERTIES"),  is or was the managing agent for VALENTIA LLC regarding the RENTAL PREMISES.

8.   At all times relevant herein, defendant DANIELLE HARRIS ("HARRIS") is or was the on-site property supervisor of the RENTAL PREMISES, and an employee of SHEA PROPERTIES.

9.   Plaintiff is further informed and believes, and on that basis alleges, that during all relevant times stated herein, defendants VALENTIA LLC and SHEA PROPERTIES are or were the agents, employees, co-venturers, representatives, partners, or in some manner agents or principals, or both for each other and were acting within the course and scope of their agency or employment, or the alleged acts or omissions of each of these Defendants as agent were subsequently ratified and adopted by each other Defendant.

10.   The named and unnamed Defendants took actions or engaged in omissions which tolled any statute of limitations and which are sufficient to justify an estoppel or waiver because Defendants' acts, representations, and/or omissions made Plaintiff unaware of Defendants' discriminatory conduct for a period of time prior to the filing of this lawsuit.

11.   Defendants' actions or omissions, as described herein, also made Plaintiff unaware of the substantial and significant defects in her rental unit, including

contamination of the living environment, and/or unaware of her causes of action and delayed discovery thereof.  Additionally, each Defendant has unclean hands.  Plaintiff relied upon each Defendants' false representations and their failure to disclose material facts, to Plaintiffs' detriment, as described herein.

12.   The true names and capacities of unnamed Defendants, whether individual, corporate, associate or otherwise, are unknown to Plaintiff.  Plaintiff is further informed and believes that the unnamed Defendants are California residents or licensed to do business in the State of California.  Pursuant to Federal Rule of Civil Procedure 15, Plaintiff will amend this Complaint to show such true names and capacities when the same have been ascertained.

### IV. <u>FACTS IN COMMON WITH ALL CAUSES OF ACTON</u>

13.   On or about October 31, 2019, plaintiff MALEK signed a lease agreement for rental unit t#336, a two bedroom unit at the RENTAL PREMISES, with an address of 5265 Toscana Way, San Diego, California.  Pursuant to that lease, plaintiff MALEK moved into rental unit #336.  The rental rate for rental unit #336 was $2,276.00, per month, with the rent due and payable on the first of every month.

14.   Prior to signing the lease for rental unit #336 at the RENTAL PREMISES, plaintiff MALEK informed Defendants and/or their agents that her son Shawn Michaels would provide services to her on a frequent basis to assist her in her daily activities as needed due to her disabilities, and that he would be spending time with her at the RENTAL PREMISES.

15.  Around the time that plaintiff MALEK first moved into the RENTAL PREMISES, she also informed Defendants and/or their agents that she and her son were extremely sensitive to mold, toxic chemicals, and other allergens as they both had asthma, and also that it was necessary for them to reside in an environment that was completely free from mold, hazardous chemicals, dust, and allergens.  Plaintiff MALEK also uses oxygen tanks to assist her breathing, of which Defendants and/or their agents

were informed and aware.

16.  Plaintiff MALEK would not have moved into the RENTAL PREMISES without receiving the assurances from Defendants that the rental unit that she agreed to lease was free from contaminants that could exacerbate her disabilities.

17.  Plaintiff MALEK is informed and believes, and herein alleges that Defendants knew that the RENTAL PREMISES had an ongoing issue with construction and maintenance defects which affected the habitability of its rental units, particularly for occupants who suffered from respiratory illnesses.

18.  Plaintiff MALEK's problems with Defendants started almost immediately upon moving into the RENTAL PREMISES.  For example, subsequent to signing the lease for rental unit #336, plaintiff MALEK discovered that there were several obvious points of water intrusion located in the master bedroom that she occupied.  One source of a water leak came from the rental unit above Plaintiff's, as evident by an approximately six inch circle water stain on the wall that was wet to the touch.  The second location of water intrusion was the master bedroom window sill, where the window appeared to be detaching and falling from the wall as a result of water damage, flaking paint, cracking corners, bubbling base board, and completely rusted blinds.

19.  There was also a third concern of water intrusion surrounding all of the air ducks in that rental unit, with evidence of water leaks, including rust and water stains streaming all the way down the walls of the rental unit.

20.  Water leaks leading to damp, moist, and wet conditions, are hazardous to plaintiff MALEK's health and well being, particularly due to her disabilities, of which Defendants were aware and which she expressed to Defendants.

21.  On or about November 8, 2019, plaintiff MALEK informed Defendants and/or their agents that rental unit #336 was in substandard condition, and requested to be transferred to another unit.

22.  On or about November 19, 2019, as a result of plaintiff MALEK requesting to be moved to a different rental unit based on the substandard conditions of rental unit

#336, Plaintiff signed a lease agreement to move to rental unit #242 (hereinafter also referred to as the "RENTAL UNIT #242"), at the same rental rate of $2276.00 per month, although Defendants had first attempted to require plaintiff MALEK to pay an additional $450 per month to lease it.

23. Defendants also never returned or transferred plaintiff MALEK's entire security deposit that she paid on rental unit #336, nor did they ever provide her with any accounting for the amount that she paid.

24. Plaintiff MALEK was first shown the RENTAL UNIT #242 in the evening after dusk by leasing assistant manager Stephanie Jones. Upon entering RENTAL UNIT #242, plaintiff MALEK detected a musty odor, which Ms. Jones stated was caused by the shampooing of the carpets, and the fact that the unit had been closed off for a while after the prior occupants had vacated, and just needed to be aired out. However, the musty odor persisted for a substantial period of time after Plaintiff moved into RENTAL UNIT #242, which caused her to concern that she would become ill from exposure to hazardous chemicals.

25. On or about January 14, 2020, Plaintiff sent an email to the defendant HARRIS with a list of items needing to be repaired, which included the request to clean the patio.

26. Despite knowing that plaintiff MALEK was suffering from several disabilities, including a mobility impairment and MCS, and the fact that she previously had her son frequently visit with her to provide her caregiver services, Defendants still required that plaintiff MALEK provide medical documentation of her need for a live-in caregiver in order to qualify to have one.

27. Once in occupancy of RENTAL UNIT #242, plaintiff MALEK noticed that the rain gutters allowed rain to accumulate on the balcony and enter into the unit's walls and floors, causing damp, wet, and moist conditions inside the unit. These rain gutters were defectively installed, which apparently was the case throughout the RENTAL PREMISES, and not properly maintained by Defendants, in that they did not clean them

from debris and objects that cluttered them and allowed water to accumulate on the patios of many of the rental units, including plaintiff MALEK's.

28. RENTAL UNIT #242 also had a jammed patio screen door and a defective lock, which made it extremely difficult for plaintiff MALEK to open and shut it, due to her physical disabilities.

29. There was also defective weather stripping at the front door, allowing rain and moisture to intrude into the RENTAL UNIT, causing damp, moist conditions.

30. In or around the middle of 2020 of her tenancy in RENTAL UNIT #242, plaintiff MALEK had informed Defendants that smoke from a gas grill, as well as cigar and marijuana smoke, was entering her unit from the patio of the rental unit below hers, causing her to suffer from an exacerbation of her respiratory disabilities. Despite Plaintiff's complaints, Defendants failed to take any actions against the resident of that unit to stop the toxic smoke intrusions into RENTAL UNIT #242, and instead began to blame plaintiff MALEK and her son for conflicts with the downstairs neighbor.

31. Defendants also attempted to evict plaintiff MALEK during the COVID-19 eviction moratorium of 2020, alleging that she was failing to pay her rent, even though she had requested rental assistance from the federal program that assisted renters who lost substantial income during the COVID period.

32. Defendants constantly harassed and threatened plaintiff MALEK with evictions during the COVID-19 eviction moratorium, which required intervention by the San Diego County Legal Aid office and Plaintiff's doctor, who provided verification that she needed to remain in her apartment as a reasonable medical accommodation during that time period.

33. In or around the end of 2020, Defendants forced plaintiff MALEK to sign an agreement wherein she would only be allowed to remain in occupancy of RENTAL UNIT #242 for an additional six months as an accommodation to her disabilities. However, the agreement required plaintiff MALEK's son and caretaker Shawn Michaels to vacate the unit, and prevented her from having any other caretaker during the six

month period.

34.  In or around December 2020, Defendants told plaintiff MALEK that there was a water leak in her unit that was affecting the rental unit below hers.  In fact, the master bathroom of Plaintiff's rental unit experienced a sewage backup and clogs in the sink and bathtub, which Defendants failed to timely and professionally repair.

35.  On or about February 5, 2021, Defendants served plaintiff MALEK with a 60 Day Notice to Terminate her tenancy, which included false allegations of violations of the lease agreement, which included unsubstantiated allegations of creating disturbances in RENTAL UNIT #242.

36. From the time that plaintiff MALEK moved into the RENTAL UNIT #242, she and her son were targeted by Defendants, particularly by defendant HARRIS, in retaliation for their complaints of Defendants failing to provide a habitable premises and failing to provide reasonable accommodations based on plaintiff MALEK's disabilities.

37.  Plaintiff MALEK continued to request that Defendants make necessary repairs to RENTAL UNIT #242, which included repairs of the water intrusions from faulty rain gutters and windows which exacerbated plaintiff MALEK's respiratory illnesses, which Defendants continued to either ignore or make faulty and unprofessional attempted repairs.

38.  Defendants also falsely accused plaintiff MALEK of violating her lease agreement after she made requests for repairs be made to RENTAL UNIT #242, as well as reasonable accommodation requests that the repairs be done in a timely and professional manner based on her disabilities.

39.  In or around third week of August 2022, plaintiff MALEK first complained to Defendants of a leak in the kitchen sink faucet, and informed Defendants' maintenance worker.  The maintenance worker attempted to repair the leak, which he failed to do in a competent and professional manner, which allowed the leak to continue.

40.  On or about December 20, 2022, Plaintiff MALEK again complained to Defendants about a leak in the kitchen faucet of RENTAL UNIT #242, which leaked

water down into the cabinet underneath the kitchen sink, causing wetness, mildew, and suspected mold to accumulate from  the presence of rust and dark spots that formed in and around the kitchen sink and cabinets.

41.  Defendants were aware of the water leak and intrusion in the kitchen faucet, sink, and cabinet area after plaintiff MALEK first notified them of the defect, but failed to take necessary corrective action by hiring competent professionals to perform maintenance and remediation.  As a result, the water intrusion continued for a substantial period of time after plaintiff MALEK first complained of the substandard conditions, which compelled her to use several fans and air purifiers throughout the unit, based on the smell that was present and the negative impact that it was having on her respiratory health, which included but was not limited to difficulty breathing.

42.  From 2021 through 2023, Defendants' harassment of plaintiff MALEK included illegal rent increases, as she was charged additional rents above the legally allowed amounts that they were able to increase her rent.

43.  In or around June 2023, plaintiff MALEK was exposed to hazardous chemicals that Defendants maintenance and/or contractors were using near her rental unit, which caused her to experience a severe skin reaction, including inflamation and redness in her face and neck, in addition to respiratory distress, which complicated her treatments, and caused her extreme pain.  As a result, Plaintiff was required to temporarily relocate to a hotel for approximately six days, for which Defendants covered the costs.

44.  After the exposure to hazardous chemicals in June 2023, plaintiff MALEK requested that she be notified of each instance in which Defendants used hazardous chemicals in or around her rental unit.  Instead of properly notifying Plaintiff of hazardous chemical usage, Defendants instead posted a general notice of the use of hazardous chemicals in the elevator of Plaintiff's building, which she may or may not have used at any given time.   Defendants otherwise failed to advice Plaintiff personally of the use of any hazardous chemicals in or around her rental unit.

45.  On or about October 5, 2023,  a licensed Occupational Therapist noted in a Home Safety and Performance Assessment what appeared to be mold, mildew, and signs of water damage in the cabinet space under the kitchen sink, defective drawers in the kitchen that came all the way out, and curtains that were difficult to open due to Plaintiff's disabilities.

46.  Plaintiff's Occupational Therapist also determined that the flooring and carpeting of  RENTAL UNIT #242 was in an unsafe condition, in that it was curled up in the center, had exposed nails in the threshold between the carpet and the hardwood flooring in the kitchen.  The assessment also determined that the threshold between the inside and outside of  RENTAL UNIT #242 was defective and caused plaintiff MALEK to trip on it, subjecting her to physical injuries.

47. Also, the assessment the Occupational Therapist determined that there were electrical cords in the walkways due to the need to use extension cords because of faulty, loose electrical plugs, as well as rusted faucets in the showers which made it difficult for plaintiff MALEK to use them because of her disabilities, as well as a heavy sliding glass door that was sticking and especially difficult to open and shut for plaintiff MALEK.

48.  In or around October 2023, plaintiff MALEK also told Defendants that the defectively installed rain gutters on the patio of RENTAL UNIT #242 had been causing rain water to accumulate on the patio and seep into the walls of the master bedroom that she occupied, causing water damage in the drywall.   Defendants never properly and professionally repaired the defective patio gutters or master bedroom drywall, which caused the walls to remain wet and damp, causing Plaintiff to experience respiratory distress to the hazardous conditions.

49.  In addition to the other habitability complaints, the master bedroom tub faucet in RENTAL UNIT #242 was jammed and was very difficult if not impossible for plaintiff MALEK to turn the water off and on due to her physical disabilities.  This situation persisted for years in the unit and was never properly or professionally repaired.  After notifying Defendants of the defective faucet in her tub, Defendants failed and refused to

properly and professionally repair this defective condition, which limited Plaintiff's use of her bath facilities.

50. Plaintiff MALEK also told Defendants that the refrigerator that they installed in RENTAL UNIT #242 was old and defective, and that the door to the refrigerator did not properly close, which caused plaintiff to lose refrigerated food and medicines that she was keeping there. Plaintiff attempted to tie the refrigerator door shut in order to keep the refrigeration to escape, which she did for at least three years prior to Defendants replacing it with another old refrigerator that they got from another rental unit.

51. On October 13, 2023, as a result of Defendants' refusal to acknowledge hazardous microbial contaminants in RENTAL UNIT, as well as damp, mildewy, and moisture conditions throughout, plaintiff MALEK hired a mold inspection specialist to conduct testing in RENTAL UNIT #242. Based on the inspection, it was determined that there were elevated moisture levels in the kitchen, living room, both bedrooms and both bathrooms. Additionally, the testing showed elevated humidity levels above 80% and the walls were moist throughout the rental unit.

52. The mold inspector also visually observed bubbling of the window frame in the kitchen, in addition to what appeared to be mold growth under the sink, and discoloration on the kitchen wall.

53. In the second bedroom, the mold inspector also visually observed that there was moisture intrusion due to the improperly sealed exterior of the window.

54. There was discoloration observed on the cabinet under the sink of the  master bathroom, and  rusting/discoloration around the shower fixtures where a seal should have been to prevent moisture from entering the wall. The inspector also observed a jacket located in the closet that was deteriorating, which was likely due to elevated humidity levels. The door of the bathroom was also swollen and water damaged.

55. Further, upon visual inspection of the balcony of RENTAL UNIT #242, the professional and licensed mold inspector observed what appeared to be water damage in the wall behind the washing machine in the balcony closet. He further observed that the

HVAC unit located on the balcony was dirty and covered in what appeared to be mold growth. A large amount of algae growth on the balcony was observed as well. It appeared that the gutters were "problematic," which was likely the cause of moisture intrusion in the walls adjacent to the sliding glass doors.

56.  The air quality samples of RENTAL UNIT #242 that were taken by the mold inspector indicated elevated levels of Penicillium/Aspergillus fungi spores under the kitchen sink, which was an indication of mold growth.  The assumption from this analysis is that there would be cross contamination throughout the residence, with mold spores settling on plaintiff MALEK's personal items, carpeting, and other surfaces.  In addition, the mold growth levels would have been even higher if it were not for the fact that Plaintiff needed to run HEPA air filters in the residence prior to testing due to health concerns.  The mold inspector further determined the likelihood of further mold growth, including the possibility of Stachybotrys or black mold being present inside the walls that registered high moisture content.

57.  As a result of the mold inspection of RENTAL UNIT #242, it was recommended that remediation be performed in compliance with IICRC S520, with the assumption that there was cross-contamination throughout the unit, and that an effort be made to prevent further contamination of Plaintiff's personal items.

58.  It was further recommended that Plaintiff's personal items in the unit be transferred to a storage unit or moved into a containment area which has been prepared as a sterilized holding area, and that all non-porous items be cleaned and sterilized to remove mold spores.  Defendants refused to comply with any of these recommendations made by the mold inspector.

59.  It was only after plaintiff MALEK provided Defendants with a copy of her mold inspection report that they agreed to remediate the kitchen area of RENTAL UNIT #242.  However, they refused to remediate any other part of the unit, and refused to professionally clean, sterilize, or safeguard any of Plaintiff's furniture and personal belongings, including her clothing, paintings, and other valuables that she bought and

sold, although they were determined to be contaminated as well.

60.  The longer that plaintiff MALEK remained in her rental unit while being exposed to hazardous contaminants, as well as wet and damp conditions, the worse her sensitivities to such conditions became.

61.  Throughout her tenancy, Defendants, particularly defendant HARRIS, attempted to force Plaintiff to vacate the Valentia Apartments by harassing her whenever she requested repairs to her rental unit, telling her and/or giving her the distinct impression that they wanted her to move instead.

62.  As a result of the water damage to her rental unit, plaintiff MALEK filed a claim with her insurance company in order to be compensated for the expenditures, including but not limited to alternative accommodations and loss of property.  Instead of reimbursing plaintiff MALEK for her expenditures, Defendants told her to seek reimbursement from her insurance company, which had already been denied.

63.  Plaintiff's insurance company further denied coverage after defendant HARRIS had admitted to it that there was a hazardous condition in the kitchen of RENTAL UNIT #242 due to a long term leak, which was not covered under Plaintiff's insurance policy.

64.  On or about October 29, 2023, as a result of the findings contained in the mold test and visual inspection of Plaintiff's rental unit which confirmed all suspicion of mold growth, it was necessary for her to vacate the unit and relocate to a hotel.

65.  Plaintiff MALEK has, and continues to be, forced to pay exorbitant hotel bills, transportation costs, meals, and other expenditures, which Defendants have refused to repay even a portion of, which has had the effect of bankrupting her of her retirement funds.

66.  Since being compelled to vacate RENTAL UNIT #242, Defendants have failed to offer Plaintiff a suitable replacement rental unit, and have failed and refused to provide evidence that someone with Plaintiff's chemical sensitivities could live in any replacement unit offered.

67. Plaintiff's health and safety have been at risk by entering rental units offered by Defendants in which hazardous chemicals were used. Defendants failed to provide this information as to most of the rental units that Plaintiff was offered as an alternative accommodation.

68. Defendants only offered Plaintiff $1,000.00 maximum as a reimbursement to cover costs for professionally cleaning, moving and storing her personal property, which was an inadequate amount to cover actual costs.

69. During the time that plaintiff MALEK was forced to be away from her rental unit due to the presence of hazardous environmental conditions, Defendants ignored her requests to be informed of when their vendors would be working inside of the rental unit, so that she could have the option of monitoring the remediation process by a professional inspector and would know what was taking place. The request was made to Defendants because of Plaintiff's critical sensitivities towards hazardous contaminants to which she may be exposed. In addition, Plaintiff also had expensive items in the RENTAL UNIT that she wanted to protect from exposure to harmful contaminants that would ruin them, some of which she used to sell to make an income to assist in paying her rent. These requests were ignored by Defendants for a substantial period of time.

70. Defendants also refused to allow plaintiff MALEK to transfer to a rental unit that Defendants were apparently using as a corporate rental. This unit would have been suitable for Plaintiff, as it did not contain carpeting throughout the unit, and was more accessible to fit the needs of a disabled person. Instead of considering the corporate unit, or a similar unit to be made available to Plaintiff, Defendant HARRIS told her that she did not qualify to rent that unit, or any other unit, because she supposedly owed rent dating back to 2020 and the COVID-19 lock down.

71. Defendants also refused to allow plaintiff MALEK to transfer to a rental unit that did not contain carpeting throughout the unit. Instead of holding that unit for Plaintiff, they would not allow her to inspect the unit, and eventually rented it to someone else. Defendants further refused to remove any carpeting of a prospective transfer unit

during a turnover of the rental.  Instead, they wanted Plaintiff to bear the cost of carpet removal and replacement once she were to vacate, as well as pay for the paint to replace the rotten base boards under the sinks.

72.  Said refusals to provide reasonable accommodations to plaintiff MALEK increased her exposure to hazardous contaminants in her RENTAL UNIT, cost her a substantial amount of money in relocating to hotels, which include but are not limited to transportation and food costs.

73.  Defendants' actions of leasing prospective transfer units to new tenants rather than having them made rent-ready and in habitable condition for plaintiff MALEK, including failing to insure that the units were not contaminated with hazardous chemicals and microbial contaminants, was extremely costly to Plaintiff's health and safety as well as creating a drain on her out-of-pocket expenditures.  Plaintiff continued to fight for her life and well-being throughout her ordeal of interactions with Defendants and/or their agents.

74.  Defendants continuously refused to reimburse plaintiff MALEK for her expenditures, which included the high costs of temporary housing and meals, although they had promised to do so, which she detrimentally relied upon.  Instead, they told her that she still owed rent for the RENTAL UNIT that she was unable to occupy due to its substandard conditions.

75.  Symptoms of Plaintiff's disability conditions worsened due to her being further exposed to hazardous chemicals and artificial scents that were often found in hotel rooms that she was forced to occupy, which made finding suitable alternative accommodations nearly impossible to find during the time that she has been forced to relocate, without incurring exorbitant costs which Defendants refused to reimburse.

76.  Plaintiff MALEK was also forced to relocate from hotel rooms which had maximum stay policies.  It was particularly difficult for Plaintiff to find suitable hotel accommodations during the 2023 holiday season, as most hotels did not have many available room rentals, if they had any at all.  As a result, she has incurred additional

expenses while trying to move from hotel to hotel with no personal transportation and while she was constantly ill from exposure to hazardous contaminants.  Where a hotel did offer an available room for Plaintiff to rent, they often were unsuitable due to Plaintiff's disabilities, as well as offering rooms at exorbitant rates. Plaintiff's physical and emotional conditions continued to deteriorate during this time period and continues unabated.

77.  On or about December 23, 2023, plaintiff MALEK was shown a rental unit #336 at the Valentia Apartments as a possible transfer unit without warning her of possible issues of contamination of the unit.  Despite knowing of her high sensitivities towards environmental airborne contaminants, as well as the rfusal to tell her beforehand of chemicals used in the remodeling and/or cleaning of the unit, Defendants still showed her a rental unit that caused her to experience symptoms of mold exposure.

78.  Plaintiff MALEK further noticed an inch or two of standing water in the dishwasher of the prospective transfer unit, which the leasing agent who was showing her the unit admitted may have been the source of a mildew oder.

79.  Plaintiff MALEK also discovered that the window in the guest bedroom of the prospective rental unit showed signs of water intrusion and what appeared to be mold growth, as the drywall surrounding the window was wet to the touch, and the paint was bubbling, crumbling, and cracking.   It also appeared as though there was an attempt to conceal the water intrusion with white paint.

80.  Upon looking on the outside of the rental unit that Plaintiff was showed as a prospective transfer unit, Plaintiff saw that the gutter had backed up and overflowed down into the window that showed obvious signs of water intrusion and dampness, which was hazardous to her health.

81.  When Plaintiff asked if the prospective rental unit could be properly remediated due to her chemical sensitivities, Defendants refused, and instead rented the unit out to another tenant.

82.  On or about February 11, 2024, plaintiff MALEK was also shown rental unit

#442, which also showed signs of water intrusion and possible mold contamination. Plaintiff was not informed beforehand if any rental units that she was shown had water intrusions from prior tenancies, or that hazardous chemicals had been used to clean or remediate the rental units, as she had repeatedly requested.

83. Instead of fixing the substandard conditions in rental unit #442, as plaintiff MALEK requested, Defendants attempted to conceal the substandard conditions with paint, and then they quickly rented that unit to someone else. This again served to prolong Plaintiff's stay in hotels that charged her exorbitant rates, which she was forced to pay because of the limited availability of suitable hotel rooms that were relatively free of moisture, mildew, and the possible presence of hazardous microbial contaminants.

84. Defendants further refused to move Plaintiff's personal belongings to a storage unit in order to prevent further possible contamination of her personal belongings, which Plaintiff could not afford to do, as she did not have the necessary funds to first clean the belongings in order to avoid cross-contaminating wherever she would move them to. Such actions and inactions on the part of Defendants continue to occur to this day.

85. It was entirely Defendants' fault for allowing the microbial contaminants to permeate RENTAL UNIT #242 for a substantial period of time due to their failure to acknowledge the presence of wet, damp, and moist conditions in the unit well after Plaintiff had reported it. Plaintiff can be held faultless.

86. In doing the acts of which Plaintiff complains, Defendants and their agents and employees acted with oppression, fraud and malice, and with wanton and conscious disregard of the rights of plaintiff MALEK.

87. By reason of Defendants' unlawful acts and practices, plaintiff MALEK suffered humiliation, loss of civil rights, the loss of quiet enjoyment of her home, mental anguish, severe bodily injury, severe emotional distress, headaches, stomach aches, and loss of sleep.

88. In the alternative, Defendants negligently failed to hire, train, and supervise

their employees and agents regarding the requirements of state and federal fair housing laws.

89.  Unless enjoined, Defendants will continue to engage in the unlawful acts and the pattern or practice of discrimination described above.  Plaintiff has no adequate remedy at law.  Accordingly, Plaintiff is entitled to injunctive relief.

90.  There now exists an actual controversy between the parties regarding Defendants' duties under the federal and state fair housing laws.  Accordingly, Plaintiff is entitled to declaratory relief.

91.  Defendants' discriminatory conduct as alleged herein was carried out with the intent to discriminate against plaintiff MALEK, and with a design to hide such discrimination.  All acts or omissions alleged to have been engaged in by Defendants herein are alleged to have been engaged in with the intent to injure Plaintiff, or with a willful and conscious disregard for Plaintiff's rights, and were fraudulent, malicious, and/or oppressive, entitling Plaintiff to recover punitive damages from each Defendant in an amount according to proof.

## A.  FIRST CAUSE OF ACTION
### [Violation of the federal Fair Housing Act]
### [Plaintiff MALEK against all Defendants]

92.  Plaintiff realleges and incorporates by reference paragraphs 1 through 91 of the Complaint herein.

93.  Defendants have violated the Fair Housing Act in that they injured Plaintiff by engaging in the following discriminatory housing practices:

A.  Discriminating in the terms, conditions, and privileges of the rental of a
     dwelling because of handicap, in violation of 42 U.S.C. section 3604(f)(2);

B.  Refusing to make a reasonable accommodations to Plaintiff MALEK in the rules, polices, practices, or services, by:

1) failing to provide her with an alternative transfer unit that limited her exposure

to hazardous chemicals due to her disabilities, when such transfer units became available and were necessary to afford Plaintiff MALEK full enjoyment of her rental housing;

2)  failing to properly and adequately notify Plaintiff of the use of hazardous chemicals being used in and around the common areas of the rental premises;

3)  failing to properly and professionally maintain Plaintiff's bathroom fixtures to allow a person with physical disabilities to use the facilities; and,

4) failing to timely, properly and professionally remediate the presence of wetness, dampness, and moist conditions in Plaintiff's rental unit, so as to allow the presence of hazardous environmental contaminants to grow inside the unit while knowing that Plaintiff had chemical sensitivity disabilities, all in violation of 42 U.S.C. section 3604(f)(3)(B);

C.  Interfering with and retaliating against Plaintiff MALEK in the exercise or enjoyment of, or on account of her having exercised or enjoyed, rights guaranteed by the Fair Housing Act, in violation of 42 U.S.C. section 3617.

## B. SECOND CAUSE OF ACTION
### [Fair Employment and Housing Act]
### [Plaintiff MALEK against all Defendants]

94.    Plaintiff realleges and incorporates by reference paragraphs 1 through 91 of the Complaint herein.

95.  Plaintiff MALEK is disabled under the California Fair Employment and Housing Act ("FEHA"), pursuant to Gov't Code sections 12955.3 and 12926.

96.  Under the FEHA, pursuant to Gov't Code §§12955(a) and (d), it is unlawful to discriminate against any person because of disability.  Further, under the FEHA, Gov't Code §12927(c)(1), defines discrimination in housing to include harassment in connection with housing accommodations; and also includes a refusal to make reasonable accommodations in rules, policies, practices, or services when the accommodations are necessary to afford a disabled person equal opportunity to use and

enjoy a dwelling.

97. California Gov't Code §12955 (f) makes it unlawful for any owner of housing accommodations to harass, evict, or otherwise discriminate against any person in the sale or rental of housing accommodations when the owner's dominant purpose is retaliation against a person who has opposed practices unlawful under this section, informed law enforcement agencies of practices believed unlawful under this section, has testified or assisted in any proceeding under this part, or has aided or encouraged a person to exercise or enjoy the rights secured by this part.

98. Under California Gov't Code §12955.7, it is unlawful to coerce, intimidate, threaten, or interfere with any person in the exercise or enjoyment of, or on account of that person having exercised or enjoyed, or on account of that person having aided or encouraged any other person in the exercise or enjoyment of, any right granted or protected by Section 12955 or 12955.1.

99. Defendants knowingly and willfully violated the applicable provisions of the FEHA by refusing to make a reasonable accommodation in failing to provide plaintiff MALEK with a habitable rental unit in compliance with local and state habitability laws, which exacerbated her disabilities; by failing to transfer her to a suitable rental unit based on her disabilities; by treating her in a hostile and abusive manner;  and by threatening her with eviction for complaining about the substandard conditions, causing serious and substantial injury to Plaintiff.

### C. THIRD CAUSE OF ACTION

### [California Civil Code Section 54.1]

### (Plaintiff against Defendants SHEA and VALENTIA LLC)

100.  Plaintiff realleges and incorporates by reference paragraphs 1 through 91 of the complaint herein.

101.  Defendants SHEA and VALENTIA LLC have violated California Civil Code §54.1(b)(3)(B) in that they have injured Plaintiff MALEK by refusing to make

reasonable accommodations in rules, policies, practices, or services, by failing to provide plaintiff MALEK with a habitable rental unit, when the accommodation was necessary to afford plaintiff MALEK full and equal opportunity to use and enjoy her RENTAL UNIT at the Valentia Apartments, as alleged herein.

### D. FOURTH CAUSE OF ACTION
### [Unruh Civil Rights Act]
### [Plaintiff MALEK against Defendants SHEA PROPERTIES and VALENTIA LLC]

102.    Plaintiff realleges and incorporates by reference paragraphs 1 through 91 of the complaint herein.

103.    Defendants SHEA PROPERTIES and VALENTIA LLC have violated the Plaintiff MALEK'S right to fair housing under the Unruh Civil Rights Act, California Civil Code §51 *et seq.* Defendants discriminated against her in the operation of the rental premises, a business establishment, because of her handicap or disability, in that these Defendants failed to provide her with a habitable rental unit or transfer unit, in order to meet her reasonable needs as a disabled tenant, as described herein.

104.  Pursuant to the Unruh Civil Rights Act, Plaintiff MALEK is entitled to statutory damages, among other remedies, of up to three times their actual damages as determined by a trier of fact, but not less than $4,000.00 for each discriminatory act of these Defendants against Plaintiff, as well as attorney fees, exemplary damages, and a civil penalty of twenty-five thousand dollars ($25,000).

///

///

///

## E.  FIFTH CAUSE OF ACTION

### [Negligence]

### [Plaintiff MALEK against Defendants SHEA PROPERTIES and VALENTIA LLC]

### (STATE HABITABILITY LAW VIOLATIONS)

105.  Plaintiffs reallege and incorporate by reference paragraphs 1 through 91 of this Complaint as though fully set forth herein.

106.  Defendants SHEA PROPERTIES and VALENTIA LLC owed plaintiff MALEK a duty to operate the rental premises in a manner that was free from unlawful discrimination and to hire, train, supervise and discipline their employees to fulfill that duty.  These Defendants negligently violated that duty by discriminating against plaintiff MALEK based on handicap by failing to provide her with a reasonable accommodations. These Defendants' violation of that duty was the result of negligence, including but not limited to:

107.  The damp, moist and mildew conditions, as well as suspected mold, which occurred in Plaintiffs' RENTAL UNIT due to lack of timely repairs to the roof and ceilings, and the failure to provide windows and/or window screens in the bathroom and bedrooms, has led to a hazardous and unhealthy living environment that Plaintiffs have lived in, and probable amplification of bacteria and microbial contamination, which conditions rendered the RENTAL UNIT unsafe and untenantable.  The potentially hazardous and unhealthy living conditions in the RENTAL UNIT, and the failure to properly remediate these conditions, fell below the standard of care entrusted to Defendants as housing providers.

108.  Instead of having the RENTAL UNIT properly inspected and remediated by competent licensed professionals, including inspection for suspected mold, and the lack of proper ventilation leading to damp and mildew conditions in the bedrooms and bathroom, Defendants instead did nothing other than attempt to cover up and paint over the physical signs of possible contaminants in the air and/or surface of the walls and

ceilings.

109.  The exposure to these conditions caused Plaintiff to suffer physical injuries including allergic, irritant, and possibly infectious responses.  The failure to advise Plaintiff that she was living in an environment that could potentially cause her serious physical injury caused her fear and apprehension of immediate or future occurrences of illness due to the expose to the contaminants.

110.  The exposure to the surface and air quality contamination experienced by Plaintiffs also resulted in personal property damage, loss of use, and other injuries, including fear of the possibility of incurring lifelong illnesses.

111.  As a direct and proximate result of Defendants' negligent maintenance of Plaintiff's rental unit, the value of Plaintiff's leasehold was substantially diminished. Consequently, Plaintiff has been damaged in an amount to be proven at trial.

112.  Defendants, and each of them, owed a duty, as the owners and operators of the RENTAL PREMISES, to provide a habitable, safe, and secure residence for Plaintiff. Plaintiff reasonably relied on the assertions of Defendants that the RENTAL UNIT was fit for its particular purpose.

113.  Further, Defendants owed a duty to perform maintenance, repairs, and renovations, to take corrective and preventive measures to insure Plaintiff's good health and safety, and to make repairs to the RENTAL UNIT in a competent manner, so as to provide for the safety and security of the occupant and her personal property, and to not deprive Plaintiff of a habitable premises or interfere with Plaintiff's beneficial enjoyment of the RENTAL UNIT.

114.  Defendants breached their duty of due care to Plaintiff by acting unreasonably for reasons including, but not limited to:

A.  Failure to train their employees regarding the requirements of state and federal fair housing laws;

B.  Failure to hire persons who were familiar with the requirements of state and federal fair housing laws;

C.   Failure to supervise their employees regarding compliance with the requirements of state and federal fair housing laws;

D.   Failure to discipline or terminate employees who failed to comply with the requirements of state and federal fair housing laws;

E.   Failure to properly investigate and decontaminate the RENTAL UNIT after being notified of environmental contamination concerns;

F.   Failure to cure defects in the RENTAL UNIT, which were known or should have been known to Defendants, and which led to the increased and prolonged presence of damp, moist conditions, and possible contaminants and unhealthy conditions;

G.   Failure to warn Plaintiff of known or suspected defects and dangerous contaminants that were present in the RENTAL UNIT;

H.   Failure to timely hire those who are professionally trained  in remediations from water intrusions that created wet, damp, moisture, and mildew conditions, as well as microbial contamination specialists to properly evaluate the possible contamination of Plaintiff's rental unit prior to and subsequent to renting it to Plaintiff;

I.   Failure to consult, read and utilize current literature regarding fungal contamination, indoor air quality and "sick building syndrome" and other materials, including but not limited to those produced by the Environmental Protection Agency and the California Department of Public Health regarding proper detection and remediation of evidence of water damage, and indoor air quality standards for rental property owners and managers; and;

J.   Failure of Defendants to hire competent and professional management to operate the RENTAL PREMISES on a daily basis.

115.  Defendants knew or reasonably should have known that failing to timely and adequately prevent water intrusions, damp, moist, and mildew conditions, failure to test for contaminants, failure to competently and professionally repair and/or replace and remediate the affected areas of Plaintiff's rental unit of possible mold spore and other indoor air contaminants, would result in injury and damage to Plaintiff.

116.  Defendants failed to take or order appropriate and timely action to avoid harm to Plaintiffs.  Ordinarily prudent housing providers such as Defendants would not have acted similarly under such circumstances.

117.  The acts of Defendants, as alleged herein, were careless and negligent. Defendants breached their duty to Plaintiff by the acts alleged herein.

118.  As a direct and proximate result of the conduct of Defendants as described herein, Plaintiff MALEK suffered illness, bodily injury, humiliation, mental anguish, emotional distress, anxiety, annoyance, discomfort,  headaches, lost wages, and property damage, all to Plaintiff's damage in an amount to be proven at trial, but in an amount that is within the jurisdictional requirements of this Court.

119.  At all times relevant herein, Plaintiff complied with her obligations as a renter, except when prevented by Defendants, and/or Plaintiff's performance was excused due to Defendants' material breach of California habitability, health and safety laws.

120.  Defendants also knew that there was a greater chance, if not a certainty, that if repairs were not properly and professionally made, that the substandard conditions would continue to be present and reoccur, causing Plaintiff further injury.

121.  None of the defective conditions were caused by the wrongful or abnormal use of the subject premises by Plaintiff or those under Plaintiff's authority and control.

122.  Defendants had long term knowledge of deficient conditions in Plaintiff's rental unit, which made for unhealthy and dangerous living environments, and posed a substantial risk of harm to Plaintiff.

123.  Defendants were also aware, or should have been aware, of possible air and surface contamination in Plaintiff's rental unit after being told of leaks, lack of proper maintenance, mildew and sweating ceilings and walls, along with the possible mold due to their failure to properly and professionally make repairs, would make anyone ill, and/or have the potential for causing long-term illness for someone who did not immediately become ill.  Despite that, Defendants failed to make immediate, adequate,

sufficient, and timely repairs to the interior of the rental unit.

124.  Defendants, and each of them, were under a duty to exercise reasonable and ordinary care, whether as property owners, property managers, water damage restoration companies, remodelers, maintenance professionals, engineers, designers, builders, plumbers, subcontractors, and/or manufacturers, to avoid reasonably foreseeable injury and property damage to Plaintiff.

125.  Defendants, and each of them, took actions or engaged in omissions which tolled any statute of limitations, and which are sufficient to justify an estoppel or waiver, as Defendants' acts, representations, and/or omissions made Plaintiff unaware of the possible substantial and significant contamination of her living environment, and of the necessity to sue and/or be aware of her causes of action, and delayed discovery thereof. Additionally, Defendants have unclean hands, as Plaintiff relied upon their false representations to an extent, as well as Defendants' failure to disclose material facts, all to Plaintiff's detriment.

126.  Plaintiff relied on the assurances of Defendants, assuming that they would fulfill their obligations as housing providers and operators, to properly rectify the substandard conditions alleged herein in a reasonable manner, and in a reasonable amount of time.

127.  Plaintiff reasonably assumed that Defendants had the knowledge of reasonably prudent housing providers and operators, and that they would take reasonable actions to safeguard Plaintiff's rental unit from exposure to the environmentally hazardous conditions, and to investigate the probability of the resultant toxic environment, in a reasonably prudent time, and that Defendants would hire competent professionals to investigate what was necessary.

///
///
///

## G. SEVENTH CAUSE OF ACTION

## RETALIATORY EVICTION

### (Plaintiff MALEK against all Defendants)

128.   Plaintiff realleges and incorporates herein by reference paragraphs 1 through 91 of the Complaint herein.

129.  Defendants threatened to evict plaintiff MALEK with the intent of violating California Civil Code §1942.5(c) in retaliation for the lawful and peaceful exercise of her rights under the law.  Plaintiff MALEK continued to pay her rent in a timely manner until she was prevented from doing so by having to vacate her rental unit, and exercising her rights to complain about not being able to use her rental unit because of the presence of wet and damp conditions made evident by Defendants' refusal to timely and professionally remediate the rental unit, thus creating the presumption of retaliation.

Defendants are also attempting to unlawfully evict plaintiff MALEK from the RENTAL UNIT for requesting that she be allowed to have a professional environmentalist monitor the remediation of the unit, as a reasonable accommodation to her based on her need to know what chemicals would be used and to what extent her personal belongings were safeguarded, which they unreasonably denied.

130.  Defendants' willful attempt to actually and/or constructively terminate plaintiff MALEK'S tenancy, in violation of her rights, entitles her to actual damages, punitive damages of at least $100.00 and up to $2000.00 for each retaliatory act, as well as attorney's fees.

## H.  EIGHTH CAUSE OF ACTION

### [Violation of the California Unfair Business Practices Statute]

### (Cal.Bus.& Prof.Code §17200 et seq.)

### (Plaintiff against Defendants SHEA PROPERTIES and VALENTIA LLC)

131.   Plaintiff realleges and incorporates herein by reference paragraphs 1 through 91 of the Complaint herein.

132.    Defendants SHEA PROPERTIES and VALENTIA LLC's acts and practices described herein constitute unfair business practices in violation of California Business and Professions Code §17200 *et seq.* (the "California Unfair Business Practices Statute").  Plaintiff MALEK brings this action for injunctive relief and restitution pursuant to the California Unfair Business Practices Statute.

## V. **RELIEF**

WHEREFORE, Plaintiff MALEK prays for judgment against Defendants as follows:

1.    For an award of compensatory and punitive damages according to proof;

2.    For an award of up to three times the amount of actual damages, but not less than $4,000.00 for each and every offense, against Defendants SHEA PROPERTIES and VALENTIA LLC, pursuant to the Unruh Civil Rights Act; and an award of not less than $100.00 and up to $2,000.00 for each retaliatory action;

3.    For a declaration that Defendants have violated the provisions of the applicable federal and state fair housing laws;

4.    For temporary, preliminary and permanent injunctive relief against all practices complained about herein and for affirmative injunctive relief requiring Defendants, their partners, agents, employees, assignees and all persons acting in concert with or participating with them, to take affirmative action to provide equal housing opportunities to all renters;

5.    For costs of suit, including reasonable attorneys' fees pursuant to contract and statute; and,

///

///

///

6.    For all such other relief as the Court deems just.


Dated: November 5, 2024


                              s/Clifford A. Dover
                              CLIFFORD A. DOVER
                              Attorney for Plaintiff SHALA MALEK


## V. <u>JURY DEMAND</u>

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff MALEK hereby requests a jury trial.


Dated: November 5, 2024


                               s/Clifford A. Dover
                              CLIFFORD A. DOVER
                              Attorney for Plaintiff SHALA MALEK